## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **CLYDE RAY HALE,** | ) | |
| Plaintiff | ) | Civil Action No. 1:22cv00038 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MARTIN J. O'MALLEY,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |
| | ) | |

### I. Background and Standard of Review

Plaintiff, Clyde Ray Hale, ("Hale"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023. Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case. Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Hale protectively filed applications for DIB and SSI on May 7, 2015, alleging disability as of February 27, 2013,[2] due to chronic obstructive pulmonary obstructive disease, ("COPD"); chest pain; arthritis in the hands, neck, arms and shoulders; carpal tunnel syndrome; swelling of the right knee; insomnia; depression; hearing loss in the left ear; color blindness; and dyslexia. (Record, ("R."), at 246-47, 253-59, 274, 531.) The claims were denied initially and on reconsideration. (R. at 133-77.) Hale requested a hearing before an administrative law judge, ("ALJ"). (R. at 178-79.) A hearing was held on February 8, 2018, at which Hale was represented by, Jennifer Morgan, ("Morgan"), a non-attorney representative.[3] (R. at 38-64.)

The ALJ issued a partially favorable decision dated April 10, 2018, finding that Hale was disabled under the Medical-Vocational Guidelines, ("Grids"), beginning February 26, 2018, when he became a person of advanced age, and

---

[2] Hale initially alleged a disability onset date of January 1, 2012, but later amended it to February 27, 2013, the date of his 50th birthday.  (R. at 41, 246, 253.)

[3] The testimony from this hearing, set out in the court's prior Report and Recommendation, is incorporated by reference and is not repeated herein.

remained disabled through the date of the decision. (R. at 16-32.) However, the ALJ found that, prior to February 26, 2018, there were jobs existing in significant numbers in the national economy Hale could perform, based on his age, education, work experience, residual functional capacity and the testimony of a vocational expert. (R. at 31.) The ALJ further specifically found Hale was not under a disability within the meaning of the Act at any time through December 31, 2015, the date last insured for DIB purposes. (R. at 32.)

After the ALJ issued his decision, Hale pursued his administrative appeals, (R. at 239-42), but the Appeals Council denied his request for review. (R. at 1-6.) Hale then filed an action seeking review of the ALJ's partially unfavorable decision. *See Hale v. Saul*, Civil Action No. 1:19cv00012. This court issued a Report and Recommendation on April 28, 2020, recommending that the final decision of the Commissioner of Social Security be vacated and the action be remanded for further consideration of two issues: (1) Hale's alleged illiteracy; and (2) the severity of his alleged panic attacks during the period prior to February 26, 2018. (R. at 636-59.) By order dated May 14, 2020, the district court accepted and approved the undersigned's Report and Recommendation, (R. at 633-34), and by order dated September 16, 2020, the Appeals Council, likewise, vacated the final decision with respect to the period prior to February 26, 2018, and remanded the case to an ALJ for further proceedings consistent with the order of the court. (R. at 662.)

On remand, additional hearings were held on September 9, 2021, and June 21, 2022. (R. at 568-74, 577-618.) By decision dated October 3, 2022, the ALJ denied Hale's claims. (R. at 531-58.) The ALJ found Hale met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2015. (R. at 535.) The ALJ found Hale had not engaged in substantial gainful activity from

February 27, 2013, through February 26, 2018.  (R. at 535.)  The ALJ determined Hale had severe impairments, namely, COPD; osteoarthritis; depressive disorder; anxiety; borderline intellectual functioning; specific learning disability; and insomnia, but he found that, prior to February 26, 2018, Hale did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 535-39.)

The ALJ found that, prior to February 26, 2018, Hale had the residual functional capacity to perform light work with certain procedural and environmental limitations; who could understand, remember and apply simple instructions and perform simple tasks; maintain attention and concentration for two-hour segments with normal breaks; frequently interact with co-workers and occasionally interact with supervisors, but could not interact with the public; perform jobs with no reading or writing requirements, with instructions and training provided either orally or by demonstration; would be off task 10 percent of the workday; and would be absent from work one day per month.  (R. at 539-40.)  The ALJ found that Hale could not perform his past relevant work.  (R. at 554.)  He found Hale was a person closely approaching advanced age with a marginal education.  (R. at 554-55.)  Based on Hale's age, education, work history and residual functional capacity and vocational expert testimony, the ALJ found a significant number of jobs existed in the national economy Hale could perform prior to February 26, 2018, including those of a machine feeder, a line attendant and a product sorter.  (R. at 557.)  Thus, the ALJ concluded Hale was not under a disability as defined by the Act prior to February 26, 2018, and was not eligible for DIB or SSI benefits.  (R. at 558.)  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2023).

After the ALJ issued his decision, Hale pursued his administrative appeals, (R. at 619-21).[4] Hale then filed this action seeking review of the ALJ's favorable decision, which now stands as the Commissioner's final decision. See 20 C.F.R. §§ 404.981, 416.1481 (2023). This case is before this court on Hale's motion for summary judgment filed on September 3, 2023, and the Commissioner's brief filed on November 2, 2023.

## II. Facts[5]

Hale was born in 1963, (R. at 246, 253), which, at all times relevant to this decision, classified him as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d). A telephonic hearing was held on September 9, 2021, with a different ALJ, at which Hale was, again, represented by Morgan. (R. at 575-618.) The ALJ clarified that the case was on remand for further consideration of Hale's anxiety issues, as well as his learning and intellectual functioning for the period prior to his 55th birthday for SSI purposes and prior to December 31, 2015, for DIB purposes. (R. at 579.) He stated he agreed with Morgan's objection in her pre-hearing brief that the May 2021 psychological consultative examination was not relevant to the period at issue, as it was a "current" evaluation. (R. at 579.) Thus, the ALJ stated he would send an interrogatory to a medical examiner after the hearing to review the records and submit opinions with respect to Hale's anxiety-

---

[4] The Appeals Council's decision reviewing the ALJ's October 3, 2022, is not contained in this record. The court assumes the Appeals Council denied Hale's request for review, otherwise the Commissioner would have brought to the court's attention the fact that the Commissioner's decision was not final.

[5] As stated above, Hale's only dispute on appeal is with respect to the ALJ's assessment of his alleged illiteracy and the effect of panic attacks on his ability to work. (Plaintiff's Memorandum In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-43). Therefore, the court will address only the facts relevant to these issues.

related limitations and intellectual functioning. (R. at 580.) The ALJ stated that, once the responses were received, a supplemental hearing could be held if necessary. (R. at 580.)

Hale testified he quit school in the eighth grade after the principal told him he was wasting the principal's time and his parents' money. (R. at 587-88.) He said he was in special education for reading from third grade until he dropped out of school and that special education was not offered in other classes. (R. at 586-88.) Hale stated he received all Fs in school, except for some Cs in first and second grade. (R. at 595-96.) He testified he also missed about every other day of school because "I just couldn't learn, and they wasn't helping me." (R. at 596.) Hale testified he studied one time for the General Educational Development, ("GED"), test with his girlfriend, but did not take it. (R. at 581.) Specifically, he said his girlfriend had some books, and they asked each other questions, but he was adamant that he did not read any questions to her. (R. at 582-84.) Hale stated they studied for 15 minutes to two hours a day, two days a week for four or five weeks. (R. at 584-85.) However, he did not take the test because there "wasn't no way [he] could [write the required 500-word essay.]" (R. at 586.)

Hale testified he began doing work for his father when he quit school, but he had done farm work since he was very young. (R. at 596-97.) He stated he did not get any additional help in reading after leaving school. (R. at 591.) Hale testified he could "read a little bit," noting he could read enough to tell the difference between a post office box and a trash can. (R. at 589.) He said he could not read street signs in unfamiliar areas, stating "[i]f I get away from home, I'm lost." (R. at 590.) Hale testified he obtained his driver's license at 18 years old, stating he took the test in a room full of people, and no one read the test to him or assisted him that he could

recall.  (R. at 590.)  He stated he did not read the notices mailed to him by the Social
Security Administration, and he learned of the hearing when Morgan called him.  (R.
at 597.)  Hale testified his most recent job operating heavy equipment did not require
him to read or write reports, stating "it was all oral."  (R. at 597.)  He said he was
fired from that job for missing two or three days of work a month due to fatigue
caused by dreaming about work all night.  (R. at 598.)  Hale also stated he suffered
from insomnia due to two to three panic attacks weekly, which he described as
smothering and not being able to be still.  (R. at 599-600.)  He said these attacks
lasted a couple of hours and resulted in difficulty returning to sleep and sleeping in
afterwards.  (R. at 599.)  When he did work the day after having a panic attack, he
would be "drained."  (R. at 606.)  Hale testified he had tried various medications for
this, but "none of it helped."  (R. at 600.)

Asheley Wells, a vocational expert, also testified at Hale's hearing.  (R. at
607-17.)  She classified all of his past work as a dozer operator, which was skilled
and heavy,[6] but some of which was performed at the medium[7] level of exertion.  (R.
at 607.)  Wells testified that a hypothetical individual of Hale's age, education and
work experience, who could perform light[8] work with certain postural and

---

[6] Heavy work involves lifting up to 100 pounds at a time with frequent lifting or carrying
of objects weighing up to 50 pounds.  If someone can do heavy work, he also can do medium, light
and sedentary work.  *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2023).

[7] Medium work involves lifting up to 50 pounds at a time with frequent lifting or carrying
of objects weighing up to 25 pounds.  If someone can do medium work, he also can do light and
sedentary work.  *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2023).

[8] Light work involves lifting up to 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this
category when it requires a good deal of walking or standing, or when it involves sitting most of
the time with some pushing and pulling of arm or leg controls.  To be considered capable of
performing a full or wide range of light work, you must have the ability to do substantially all of

environmental limitations;[9] who could understand, remember and apply simple instructions with a reasoning level of one and perform simple, unskilled tasks; who should have no interaction with the public; and who could not perform any jobs requiring reading or writing, with instructions and training provided either orally or by demonstration, could not perform any of Hale's past work, but could perform jobs existing in significant numbers in the national economy, including those of a housekeeper, a machine feeder and a slicing machine tender. (R. at 608-09.) Wells next testified that the same individual, but who also was limited to mathematics and language level one, could perform the same jobs. (R. at 609.) Wells testified that "level one" was consistent with a marginal education, which is defined in the regulations as an education of sixth grade and below. (R. at 610.) She testified that employers for the identified jobs would tolerate an off-task rate of no more than 10 percent of the workday outside of normal breaks and absences of no more than one day monthly on a consistent basis. (R. at 610.)

A supplemental telephonic hearing was held on June 2, 2022, at which Morgan was present, but Hale was not, as Morgan had not been able to contact him after he had gotten a new phone number. (R. at 566-74.) Morgan agreed to proceed, as the ALJ explained that the purpose of the hearing was to take vocational expert testimony, and he stated he would give Morgan the opportunity to speak with Hale after the hearing and submit a response or request a supplemental hearing if necessary. (R. at 568-70.) Brian Bierley, the vocational expert, agreed with vocational expert Wells's classification of Hale's past work. (R. at 570-71.) Bierley

---

these activities. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2023).

[9] I find it unnecessary to specify these limitations since Hale's arguments on appeal center around his alleged illiteracy and panic symptoms.

testified that a hypothetical individual of Hale's age, education and work experience, who could perform light work, with certain postural and environmental limitations; who could understand, remember and apply simple instructions and perform simple tasks; who could maintain attention and concentration for two-hour segments with normal breaks; who could frequently interact with co-workers, occasionally interact with supervisors and never interact with the public; and who should have no reading or writing requirements, with instructions and training being provided either orally or by demonstration, could not perform Hale's past work, but could perform other jobs existing in significant numbers in the national economy, including those of a machine feeder, a line attendant and a product sorter. (R. at 571-72.) Bierley testified being off task 15 percent or more consistently would exclude all occupations, as would consistently missing eight hours or more monthly. (R. at 572.) The ALJ held the record open for 21 days to allow Morgan to speak with Hale. (R. at 573.)

By decision dated October 3, 2022, the ALJ denied Hale's claims. (R. at 531-58.) The ALJ found Hale met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2015. (R. at 535.) The ALJ found Hale had not engaged in substantial gainful activity from February 27, 2013, through February 26, 2018. (R. at 535.) The ALJ determined Hale had severe impairments, namely, COPD; osteoarthritis, depressive disorder; anxiety; borderline intellectual functioning; specific learning disability; and insomnia, but he found that, prior to February 26, 2018, Hale did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 535-39.)

The ALJ found that, prior to February 26, 2018, Hale had the residual functional capacity to perform light work with certain procedural and environmental limitations; could understand, remember and apply simple instructions and perform simple tasks; maintain attention and concentration for two-hour segments with normal breaks; frequently interact with co-workers and occasionally interact with supervisors, but could not interact with the public; perform jobs with no reading or writing requirements, with instructions and training provided either orally or by demonstration; would be off task 10 percent of the workday; and would be absent from work one day per month. (R. at 539-40.) The ALJ found that Hale could not perform his past relevant work. (R. at 554.) He found Hale was a person closely approaching advanced age with a marginal education. (R. at 554-55.) Based on Hale's age, education, work history and residual functional capacity and vocational expert testimony, the ALJ found a significant number of jobs existed in the national economy Hale could perform prior to February 26, 2018, including those of a machine feeder, a line attendant and a product sorter. (R. at 557.) Thus, the ALJ concluded Hale was not under a disability as defined by the Act prior to February 26, 2018, and was not eligible for DIB or SSI benefits. (R. at 558.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2023).

In rendering his decision, the ALJ reviewed records from Dr. Josephine Cader, M.D., a state agency physician; Alan D. Entin, Ph.D., a state agency psychologist; Stonsa Insinna, Ph.D., a state agency psychologist; Dr. Tony Constant, M.D., a state agency physician; Holston Valley Hospital and Medical Center; Johnston Memorial Hospital; Bristol Regional Medical Center; Stone Mountain Health Services Davenport Clinic; William A. Davis Clinic; Dr. Ryan Curfiss, D.O.; Southwest Regional Adult Education Program; David Dietrich, Ph.D., L.C.P., a licensed clinical psychologist; Wade Smith, M.S., S.P.E., a licensed senior

psychological examiner; Marshall D. Tessnear, Ph.D., a clinical psychologist; and Steven Lawhon, Psy.D., a licensed clinical psychologist.

Hale saw Dr. Pema O. Bhutia, M.D., at the William A. Davis Clinic, from January 17 to April 22, 2013, for various ailments, including depression, anxiety and insomnia. (R. at 494-510.) On January 17, 2013, Hale reported depression, sleep issues, worry, anxiety and daily panic attacks. (R. at 505.) He was taking Celexa and had run out of Vistaril, and Dr. Bhutia noted Hale was to begin Paxil the following month. (R. at 506.) On exam, he was awake and alert, with proper orientation, but his mood and affect were flat. (R. at 506.) Dr. Bhutia diagnosed depressive disorder, not elsewhere classified; and anxiety state, unspecified, and she intended to taper Hale off Celexa and start Cymbalta. (R. at 506.) Hale declined counseling, although Dr. Bhutia strongly advised it, stating "[w]hat use is it? It isn't going to help me any." (R. at 506.) Dr. Bhutia noted Hale's insomnia was due to anxiety, and she counseled him on sleep hygiene. (R. at 506-07.) Later that month, Hale reported he did not tolerate Cymbalta, as it made him more anxious and restless. (R. at 502.) He reported continued sleep issues, stating he slept about five hours nightly, which increased his irritability. (R. at 502.) He reported continued depression, but denied suicidal and homicidal ideation, as well as hallucinations and delusions, and he said he stayed anxious. (R. at 502.) On exam, he was awake and alert, with appropriate judgment; good insight; proper orientation; intact recent and remote memory; mildly low mood; and appropriate affect. (R. at 503.) Dr. Bhutia noted that Hale was "actually smiling for a change." (R. at 503.) She added insomnia, unspecified, to his diagnoses and prescribed trazodone for both insomnia and depression. (R. at 503.) Dr. Bhutia gave Hale Vistaril samples for acute anxiety attacks, and he continued to decline a referral for counseling. (R. at 503.) On February 20, 2013, Hale reported getting more sleep with trazodone, but it was

causing "crazy" dreams and might have caused him to sleepwalk.  (R. at 499.)  His mental status exam was unchanged, as were his diagnoses.  (R. at 500.)  Hale wished to stay on trazodone, as it was helping him sleep, and he stated he would discontinue it if the dreams recurred.  (R. at 500.)  When Hale reported his depression was no better, Dr. Bhutia advised him to start Paxil as prescribed, and she scheduled an appointment with a psychiatrist.[10]  (R. at 500.)  On March 25, 2013, Hale reported he was tolerating the trazodone, denying further nightmares or "crazy" dreams, but he did not start the Paxil as instructed.  (R. at 496.)  His mental status exam and diagnoses, again, were unchanged, and Dr. Bhutia stressed the importance of starting Paxil for depression and anxiety.  (R. at 497-98.)  She noted Hale continued to take Vistaril as needed for anxiety attacks, and they discussed sleep hygiene and continuing trazodone for insomnia.  (R. at 498.)  On April 22, 2013, Hale's diagnoses remained the same, and he received more Vistaril samples for acute anxiety attacks. (R. at 494-95.)

On January 30, 2016, Hale saw Dr. Ryan Curfiss, D.O., for a consultative examination at the request of Disability Determination Services.  (R. at 520-26.)  Dr. Curfiss noted Hale had been having panic attacks for the prior four to five years, for which Paxil and Vistaril were discontinued due to side effects.  (R. at 520.)  He further noted Hale had not seen anyone since 2013 for anxiety.  (R. at 520.)  Hale reported daily panic attacks that usually occurred at night, during which he experienced sweating, not wanting to be alone, shortness of breath, rapid breathing and an impending sense of doom.  (R. at 520-21.)  He denied depression.  (R. at 522.)  Hale lived alone and could cook, clean, feed and bathe himself; he spent time visiting his father; he watched television; and he denied having any hobbies. (R. at

---

[10] There is no evidence in the record that Hale ever saw a psychiatrist.

521.)  Dr. Curfiss noted Hale last worked in 2010 operating heavy equipment, but was fired after missing work due to pain.  (R. at 521.)  On exam, Hale was alert and fully oriented, with fluent and comprehensible speech; appropriate mood and affect; linear and logical thought process; appropriate fund of knowledge; and he did not complain of decreased memory.  (R. at 522.)  Dr. Curfiss opined Hale's panic attacks likely would benefit from selective serotonin uptake inhibitor, ("SSRI"), therapy and psychiatric care.  (R. at 523.)  He further opined that Hale's symptoms had minimal impact on his activities of daily living since they mainly occurred at night.  (R. at 523.)

On February 8, 2016, Alan D. Entin, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Hale had no restriction on his activities of daily living; no difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration.  (R. at 84.)  He opined Hale was mildly limited in maintaining social functioning.  (R. at 84.)  Therefore, Entin concluded Hale did not have a severe anxiety disorder.  (R. at 84.)  On July 12, 2016, Stonsa Insinna, Ph.D., a state agency psychologist, completed a PRTF, which mirrored that of Entin.  (R. at 119-20.)

On May 21, 2019, Karen Gent, Lead Teacher at Southwest Regional Adult Education Program, administered the Test of Adult Basic Education, ("TABE"),[11] 11 Literacy Test to Hale, at Morgan's request.  (R. at 819.)  Gent stated Hale took three parts of the test: reading, mathematics and language.  (R. at 819.)  In reading,

---

[11] The TABE is an extensive assessment that evaluates an individual's grasp on the core skills necessary for success in education and the workplace.  *See* https://study.com/academy/popular/what-is-a-tabe-test.html (last visited Feb. 8, 2024).

he scored 37/40, corresponding to a grade equivalent of 3; in mathematics, he scored 32/35, corresponding to a grade equivalent of 3; and in language, he scored 26/35, corresponding to a grade equivalent of 2.  (R. at 819.)

On May 7, 2021, David Dietrich, Ph.D., L.C.P, a licensed clinical psychologist, and Wade Smith, M.S., S.P.E., a senior psychological examiner,[12] conducted a consultative psychological evaluation of Hale at the request of Disability Determination Services.  (R. at 851-56.)  Hale was cooperative throughout the interview, and rapport was established and maintained throughout.  (R. at 851.) He reported quitting school during the eighth grade at 15 years of age because he "couldn't learn nothing.  They wouldn't help me."  (R. at 852.)  He said he began receiving special education services in third or fourth grade, was retained in fourth grade, made Fs in high school and never attempted to obtain a GED.  (R. at 852.) According to Hale, he most recently worked as a bulldozer operator for seven months about eight years previously, but was fired for missing work.  (R. at 852.) Aside from one counseling session about 10 years previously, he reported no other such sessions, psychiatric consultations or psychiatric hospitalizations.  (R. at 852.) Hale said he took a sleep aid for three years, and he had taken psychotropic medications beginning about ten years previously for poor sleep and panic attacks. (R. at 852.)  On exam, Hale made appropriate eye contact; hygiene and grooming were fair; no psychomotor abnormalities were noted; he did not appear to be exaggerating his symptoms; his mood was reported as generally "happy go lucky" and currently "I ain't real comfortable;" affect was subdued, mildly depressed, stable, full range, normal intensity, congruent to content and moderately reactive; speech was fluent and grammatical, of low rate, but of normal rhythm, volume,

---

[12] It appears from the record that Smith conducted the evaluation, while Dietrich signed off on it.

articulation, modulation and prosodic variation; there was no looseness of associations or other symptoms of formal thought disorder; he denied suicidal or homicidal ideation, and no hallucinations or delusions were elicited; he was alert and fully oriented, with intact attention; he had intact short-term concentration; he could spell "world" backwards; he completed Serial 3s with one error in six calculations, requiring 40 seconds; his short-term memory was somewhat limited, as evidenced by recalling one of three words after five minutes; he had intact recent and remote memory, evidenced by recall during the interview; his numerical reasoning generally was accurate and quick; visuospatial ability was normal; intelligence was in the borderline range; and he obtained a Mini-Mental Status score of 25/27. (R. at 852-53.)

Smith also administered psychological testing, including the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Hale obtained a full-scale IQ score of 74, placing him in the borderline range of intellectual functioning. (R. at 853.) He obtained a Verbal Comprehension Index of 78, a Perceptual Reasoning Index of 81, a Working Memory Index of 80 and a Processing Speed Index of 74. (R. at 853.) On the Wide Range Achievement Test – Fifth Edition, ("WRAT5"), Hale obtained a Word Reading standard score of 60, with a grade equivalent of 2.0. (R. at 853.) Smith found it unclear from Hale's symptom list that he was actually having panic attacks, and he found Hale did not meet the criteria for panic disorder. (R. at 853-54.) Smith noted Hale's activities of daily living, which included frequently shopping for groceries, traveling to the store three to five times weekly, washing dishes, doing laundry, taking out trash, cooking and performing yard work. (R. at 854.) He opined Hale had the financial acumen necessary to make his own purchases, as evidenced by his ability to accurately estimate the price of several staple items, and his report that he manages his own bank account and pays

his monthly bills by issuing debits over the phone or scheduling autodrafts. (R. at 854.) Hale reported having two close friends, visiting a childhood friend once or twice weekly, being close to two relatives, being on good terms with his neighbors and typically having good relations with co-workers and supervisors. (R. at 854.) Although Smith noted that Hale's interpersonal skills seemed limited in some instances by irritability, Hale related appropriately to him. (R. at 854.) Smith found Hale demonstrated normal psychiatric independence in his daily activities. (R. at 854.)

Smith diagnosed Hale with borderline intellectual functioning; specific learning disorder, with impairment in reading; and unspecified anxiety disorder, among other things. (R. at 855.) He opined he was moderately limited in his ability to understand and remember aurally-presented general items and concepts, but he should be able to comprehend and follow both simple and some detailed job instructions. (R. at 854.) Smith also opined Hale was moderately to markedly limited in his ability to understand written information by his learning disorder. (R. at 854.) He further opined Hale's concentration and persistence were adequate to make simple or some detailed work-related decisions. (R. at 855.) Smith opined Hale was mildly limited in his ability to interact with others appropriately, to adapt to workplace changes, to be aware of normal hazards and to take appropriate precautions. (R. at 855.) Lastly, Smith opined Hale's physical problems may detract from his ability to maintain attendance and meet an employment schedule. (R. at 855.)

On May 19, 2021, Smith completed a mental assessment, finding Hale was not limited in his ability to understand, remember and carry out simple instructions and to make judgments on simple, work-related decisions. (R. at 858-60.) He found

Hale was slightly limited in his ability to interact appropriately with supervisors and co-workers.  (R. at 859.)  He found Hale had a fair to a seriously limited ability to interact appropriately with the public.  (R. at 859.)  Smith found Hale had a seriously limited ability to understand, remember and carry out complex instructions; and to make judgments on complex, work-related decisions.  (R. at 858-59.)  In support of his findings, Smith explained that Hale's ability to process complex information was limited by innate intellectual deficits; personality traits made Hale a poor fit for working with the public; and concentration occasionally would be affected by chronic pain.  (R. at 858-59.)

On September 21, 2021, Marshall D. Tessnear, Ph.D., a clinical psychologist, wrote a letter to the ALJ in response to his medical interrogatories in Hale's case. (R. at 875-76.)  He stated there is "practically no relevant evidence from [February 27, 2013, through February 26, 2018]. …"  (R. at 875.)  Tessnear noted the relevant evidence that was available included diagnoses of depressive disorder, not elsewhere classified; and unspecified anxiety state, but that there was little symptom description, and Hale's functional abilities during this time could only be inferred from brief, two-line mental status observations that were normal, except for "low" mood.  (R. at 875.)  According to Tessnear, such inferences from that information would be "pure guesswork" for most of the questions in the interrogatory, other than to say that there is insufficient evidence to indicate that Hale's impairments would have met or equaled a listing.  (R. at 875.)  Tessnear also noted that, in January 2016, Hale's activities of daily living were sufficient for his personal care, and he reported his anxiety symptoms mainly were at night and had minimal impact on his activities of daily living.  (R. at 875.)  Again, Tessnear noted insufficient evidence from that period of time for him to answer most of the questions in the interrogatory.  (R. at 875.)

Next, Tessnear stated that Smith's May 2021 consultative psychological evaluation contained some relevant evidence for the earlier period, in that the diagnoses of borderline intellectual functioning and specific learning disorder (reading), were conditions usually evident in childhood and typically endured through adulthood, and their limitations would have applied to the earlier period. (R. at 875.)  Tessnear stated the diagnosis of unspecified anxiety disorder also appeared in the earlier period, although it was explained better in Smith's report.  (R. at 875.)  While Tessnear believed these current impairments and limitations would have been present in the earlier period, he relied heavily on Smith's consultative psychological evaluation in completing the interrogatories.  (R. at 875.)  Tessnear also found that Hale's impairments did not meet or equal a listed impairment, either currently or during the earlier period.  (R. at 876.)  In particular, he opined Hale's ability to understand, remember or apply information was moderately limited by borderline intellectual functioning and his problems reading, but he should be able to perform simple tasks.  (R. at 876.)  He opined Hale would have significant difficulty with highly detailed or complex tasks and with tasks involving reading beyond the second- or third-grade level. (R. at 876.) Tessnear opined Hale's ability to interact with others was mildly limited, noting his reports of having friends, being on good terms with neighbors and having good relationships with co-workers and supervisors previously.  (R. at 876.)  He noted Hale had occasional irritability, most likely from chronic pain, which, in addition to some degree of anxiety, would make it difficult for him to effectively work with the general public.  (R. at 876.)  Tessnear opined Hale's ability to concentrate, persist or maintain pace would probably be no more than mildly limited by anxiety.  (R. at 876.)  Lastly, he found Hale's ability to adapt or manage himself would be no more than mildly limited, noting he could control his behavior, maintain personal hygiene and be aware of hazards.  (R. at 876.)

On the Medical Interrogatory form submitted to Tessnear for the period February 27, 2013, through February 26, 2018, he indicated Hale was mildly limited in his ability to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself; and moderately limited in his ability to understand, remember or apply information.  (R. at 877-82.)  He found Hale could understand, remember and carry out simple instructions on a sustained basis; he could perform simple, repetitive tasks on a sustained basis; he could not understand, remember and carry out detailed instructions on a sustained basis; he could not perform complex tasks on a sustained basis; he could frequently interact with co-workers; he could occasionally interact with supervisors; he could not interact with the general public; he would be off task eight to 10 percent during a typical eight-hour workday; he would be absent from work one day monthly due to his impairments; and he could maintain attention and concentration for two-hour segments.  (R. at 881-82.)

Tessnear also completed a mental assessment on September 21, 2021, finding that Hale was not limited in his ability to understand, remember and carry out simple instructions; he was slightly limited in his ability to make judgments on simple, work-related decisions; to interact appropriately with supervisors and co-workers; and to respond appropriately to usual work situations and to changes in a routine work setting; he had between a fair and seriously limited ability to interact appropriately with the public; and he was seriously limited in his ability to understand, remember and carry out complex instructions; and to make judgments on complex, work-related decisions.  (R. at 883-85.)  Tessnear noted that Hale's concentration, persistence or pace also were affected by his impairments.  (R. at 884.)  He stated that the limitations he found were first present in 2013.  (R. at 884.)

On October 26, 2021, Steven Lawhon, Psy.D., performed a psychological evaluation of Hale via telehealth at Morgan's request.  (R. at 886-90.)  Hale's grooming and hygiene were satisfactory, and he was cooperative with the evaluation. (R. at 886.)  Lawhon noted Hale lived alone, and he quit school in eighth grade and did not obtain his GED.  (R. at 887.)  He further noted Hale previously was prescribed Cymbalta, Celexa and Elavil by his primary care provider, but was not currently taking any of these.  (R. at 887.)  He also noted Hale briefly received counseling about 10 years previously, but was not currently receiving such services. (R. at 887.)  Hale admitted to depression, anxiety and some problems with anger. (R. at 889.)  On exam, Hale's mood was anxious and depressed, and he reported decreased sleep; he denied suicidal or homicidal ideation, hallucinations and delusions; he did not recall the name of the current president, nor could he complete common proverbs; he could complete Serial 7s, and he recalled one of three objects, suggesting short-term memory impairment; he knew the colors of the American flag and the shape of a ball, but could not discuss current events or spell "world" backwards; and he was rational, oriented and did not display evidence of a thought disorder.  (R. at 887-88.)  He reported cooking, but not much, occasionally grocery shopping, sweeping, cleaning, doing laundry, mowing his yard and watching television, but said he did not engage in social media. (R. at 888.)  Hale's intellectual functioning was estimated to be in the borderline range.  (R. at 888.)  He denied any hobbies or activities and stated he preferred not to go out in public.  (R. at 888.) Lawhon noted Hale had friends and could relate to others, and he was intelligent enough to manage his own funds, but he had limited reading and writing skills.  (R. at 888.)

Lawhon administered the Neurological Symptom Checklist.  (R. at 889.) Among other things, Hale reported problems thinking as clearly as before, having

difficulty concentrating and being easily distracted. (R. at 889.) He reported having problems understanding others and following conversations with reading and writing. (R. at 889.) Lawhon diagnosed panic disorder; agoraphobia; and depression due to a medical condition. (R. at 889.) He opined Hale was mildly to moderately limited in his ability to understand and remember; moderately limited in his ability to sustain concentration and persistence; not significantly limited in social interaction; and severely limited in work adaptation. (R. at 889.) Lawhon recommended Hale be referred to either a psychiatrist or a primary care provider for psychiatric medication management and that he be referred for mental health counseling and other psychological services. (R. at 890.)

On November 22, 2021, Lawhon completed a Medical Interrogatory form for the period February 27, 2013, through February 26, 2018. (R. at 891-96.) He opined Hale was mildly limited in his ability to interact with others; moderately limited in his ability to understand, remember or apply information and to adapt or manage himself; and markedly limited in his ability to concentrate, persist or maintain pace. (R. at 892.) Lawhon also found that Hale's impairments met or medically equaled the following listings of 20 C.F.R. Part 404, Subpart P, Appendix 1: §§ 12.02(C), 12.04, 12.06, 12.15, 12.00G and 12.05.[13] (R. at 893.) He found Hale had diagnoses of panic and/or anxiety disorder, as well as insomnia, during the period at issue, noting that medical records from Stone Mountain Health Services suggested Hale had significant psychiatric problems as early as October 5, 2010, for which he was prescribed medication. (R. at 892-93.) Lawhon stated that chronic insomnia can affect the functioning of the brain, heart and other parts of the body, and it can

---

[13] These listings are for Neurocognitive disorders; Depressive, bipolar and related disorders; Anxiety and obsessive-compulsive disorders; Trauma- and stressor-related disorders; Paragraph C criteria; and Intellectual disorder, respectively. *See* 20 C.F.R. 404, Subpt. P, App. 1, §§ 12.02(C), 12.04, 12.06, 12.15, 12.00G, 12.05.

worsen existing health problems, including anxiety and depression.  (R. at 893-94.)
He stated that individuals with sleep problems typically had problems concentrating,
making more mistakes on the job.  (R. at 894.)  Lawhon also stated that poor sleep
likely would exacerbate feelings of anxiety, depression or irritability.  (R. at 894.)
He opined Hale was experiencing anxiety both during the day and nighttime hours.
(R. at 895.)  Lawhon further stated Hale's anxiety was causing sleep difficulty, panic
and night terrors.  (R. at 895.)  He opined Hale likely would miss one or more
workdays weekly unless his insomnia was successfully treated. (R. at 895.)  Lawhon
noted Hale was functioning in the borderline range of intelligence, otherwise
referred to as a "slow learner category." (R. at 895.)  That being the case, he said
Hale had trouble functioning even with adequate sleep, and he likely would be off
task 30 to 50 percent more per day without proper sleep.  (R. at 895.)

    Lawhon opined that, because Hale currently was not receiving any psychiatric
medication, he might have difficulty concentrating for two hours at a time, but, with
treatment, he thought Hale could "perform successfully for approximately 2 hours
of our an eight hour period."  (R. at 895.)  He stated that, based on his review of the
sole sample of Hale's handwriting,[14] he did not retain the capacity to recognize the
meaning of 2500 (two or three syllable words), read at a rate of 95 to 120 words per
minute, and compare similarities and differences between words and between series
of numbers.  (R. at 896.)  He also stated Hale did not retain the capacity to print
simple sentences containing a subject, verb and object, and series of numbers, names

---

[14] As noted in the previous Report and Recommendation, this sample was on a form
captioned "Claimant's Medications" and was a description of Hale's nonprescription medications
and the reasons he was taking them.  (R. at 651.)  Hale's answer is mixed with both printed and
cursive writing; there is no appropriate punctuation or capitalization; and there are some apparent
misspellings.  Hale wrote: "NONE MY DOC toll me to take Bend [illegible] itch nyquil it help
[illegible] month."  (R. at 330, 652.)

and addresses.  (R. at 896.)  Lawhon explained his answers by stating that Hale's ability to read and write was limited; therefore, his ability to print simple sentences would be limited, and his understanding of numbers, names and addresses likely would include multiple mistakes.  (R. at 896.)

On August 25, 2022, Tessnear completed another Medical Interrogatory form, which was submitted by Morgan and approved by the ALJ.  (R. at 90-09.)  In it, among other things, he stated a review of Hale's testimony would not be helpful because, if it was consistent with the record, it would simply have confirmed what was contained in the record, and, if it was not consistent with the record, then it likely would have been given less weight in his opinion.  (R. at 907.)  Tessnear stated the evidence established that Hale suffered chronic psychological conditions that reasonably could cause the symptoms alleged, but diagnoses alone may not describe symptom severity.  (R. at 907.)  He found that the evidence did not show Hale complained of and received treatment for depression and anxiety from February 27, 2013, to February 26, 2018, stating Hale had four appointments during the first half of 2013, only two of which were during the period in question, and there was no record of treatment after July 1, 2013.  (R. at 907.)  Tessnear also noted there were three visits in 2010 and 2012, and a medical consultative examination from 2016 noted anxiety, but this was not a treatment visit. (R. at 907.)  He found that, for the period in question, Hale had a diagnosis of insomnia, but because it was only during the first half of 2013, not the entire period, it was not a chronic condition.  (R. at 908.)  Although Tessnear stated he could not determine the number of words of which Hale might recognize the meaning, he opined it would be fewer than the average high school graduate.  (R. at 909.)  He opined that, based on IQ testing and reading level assessments of second or third grade, Hale would unlikely be able to read at that rate, and his Similarities WAIS-IV subtest score suggested a below

average ability to compare similarities and differences.  (R. at 909.)  Tessnear found

no evidence in the record to suggest Hale was a malingerer.  (R. at 909.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims.
*See* 20 C.F.R. §§ 404.1520, 416.920 (2023). *See also Heckler v. Campbell*, 461 U.S.
458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This
process requires the Commissioner to consider, in order, whether a claimant 1) is
working; 2) has a severe impairment; 3) has an impairment that meets or equals the
requirements of a listed impairment; 4) can return to his past relevant work; and 5)
if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If
the Commissioner finds conclusively that a claimant is or is not disabled at any point
in this process, review does not proceed to the next step. *See* 20 C.F.R. §§
404.1520(a)(4), 416.920(a)(4) (2023).

Under this analysis, a claimant has the initial burden of showing that he is
unable to return to his past relevant work because of his impairments. Once the
claimant establishes a prima facie case of disability, the burden shifts to the
Commissioner. To satisfy this burden, the Commissioner must then establish that
the claimant has the residual functional capacity, considering the claimant's age,
education, work experience and impairments, to perform alternative jobs that exist
in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B);
*McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-
65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Hale argues the ALJ erred by failing to comply with this court's remand order concerning his alleged illiteracy.  (Plaintiff's Brief at 6-24.)  He also argues the ALJ erred by ignoring the court's urging to consider his history of severe panic attacks. (Plaintiff's Brief at 24-35.)   Finally, Hale argues the ALJ erred by failing to adequately develop the record with respect to these two issues.  (Plaintiff's Brief at 36-43.)

The regulations list the following four categories of education: (1) illiteracy; (2) marginal education; (3) limited education; and (4) high school education and above.   *See* 20 C.F.R. §§ 404.1564(b)(1)-(4), 416.964(b)(1)-(4) (2023).   In his decision, the ALJ thoroughly and correctly set out the legal standard for determining whether an individual is illiterate.  As the ALJ stated in his decision, the regulations define illiteracy as "the inability to read or write."  (R. at 555.)  20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1).  A claimant is considered illiterate "if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name."  (R. at 555.)   20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1).  "Generally, an illiterate person has had little or no

formal schooling," 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1), but the Social Security Administration recognizes that even someone with formal schooling may be deemed illiterate.  (R. at 555.)  *See* 20 C.F.R. §§ 404.1564(b), 416.964(b) ("[T]he numerical grade level that you completed in school may not represent your actual educational abilities.  These may be higher or lower.").  The ALJ also noted that a "marginal education" means an ability in reasoning, arithmetic and language skills which are needed to do simple, unskilled types of jobs and that formal schooling at a sixth-grade level or less generally is considered a marginal education. (R. at 555.) He stated that a "limited education" means ability in reasoning, arithmetic and language skills, but not enough to allow a person with such educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs.  (R. at 555.)  The ALJ also stated that a seventh-grade through eleventh-grade formal education generally is considered a limited education.  (R. at 555.)

The ALJ also discussed Social Security Ruling, ("S.S.R."), 20-1p, which provides guidance in determining an individual's education category.  (R. at 555.) He noted that S.S.R. 20-1p states, in relevant part:

> "We generally use the highest numerical grade level of formal education an individual as completed in school […] to determine whether the individual belongs in the education category of high school education and above, limited education, or marginal education.  An individual's highest numerical grade level generally reflects the individual's educational abilities, such as reasoning, arithmetic, and communication skills.  The highest numerical grade level that the individual completed in school, however, may not represent his or her actual educational abilities.  Evidence such as past work experience, the kind of responsibility an individual may have had when working, daily activities, hobbies, results of testing, community projects, or vocational training, may show that an individual's actual educational abilities are higher or lower than his or her formal education level.  In such

situations, we may assign an individual to a higher or lower education category, as appropriate. … In all cases, we determine facts on an individual basis. Therefore, to assign an individual to an education category lower or higher than his or her highest level of formal education, there must be specific evidence supporting the finding in the determination or decision."

(R. at 555.) S.S.R. 20-1p, 2020 WL 1285114, at *2-3 (Mar. 9, 2020). The ALJ continued by stating that S.S.R. 20-1p also provides that:

> "We will assign an individual to the illiteracy category only if the individual is unable to read or write a simple message in any language. … Most individuals who have completed at least fourth grade can read and write a simple message. We will generally find that an individual who completed fourth grade or more is able to read and write a simple message and is therefore not illiterate. We may still find, however, that an individual with at least a fourth grade education is illiterate if the individual provides evidence showing that despite having completed fourth grade or more, he or she cannot, in fact, read or write a simple message in any language."

(R. at 555.) S.S.R. 20-1p, 2020 WL 1285114, at *3-4. The ALJ continued to explain that S.S.R. 20-1p provides that examples of relevant evidence may include the following: whether an individual has received long-term special education related to difficulty learning to read or write at a basic level; whether he lacks work history due to an inability to read or write; whether he has valid intelligence test results that demonstrate an inability to read or write a simple message; and whether he has any other evidence demonstrating an inability to read or write a simple message. (R. at 555-56.) *See* S.S.R. 20-1p, 2020 WL 1285114, at *4. As the ALJ stated, S.S.R. 20-1p provides that an individual who has completed a fourth-grade education or more would be assigned to the illiteracy category only if the evidence supported the finding that, despite having completed a fourth-grade education or more, the

individual is unable to read or write a simple message in any language.  (R. at 556.)
He noted that this Ruling also provides that "[w]e will not rely on test results alone
to determine that illiteracy is the appropriate education category for an individual."
(R. at 556.)  S.S.R. 20-1p, 2020 WL 1285114, at *4.

Thus, as stated above, the ALJ very thoroughly set out the standards for
determining an individual's education category, one of which is illiteracy.   In
accordance with these standards, the ALJ then proceeded to cite to the evidence in
this case which he found supported a finding that Hale had a marginal education, but
was not illiterate.  As stated herein, Hale completed only the seventh-grade level of
formal schooling, having to repeat the fourth grade, and he was placed in special
education for reading from the third grade until the time he quit school in the eighth
grade.  The ALJ first stated that test results did not clearly demonstrate illiteracy.
(R. at 556.)  This is true, insofar as test results alone cannot show illiteracy, as stated
above.  However, the test results indicated Hale had a second- or third- grade reading
level, well below his formal schooling level of seventh grade.  Moreover, while
psychologist Tessnear did not administer literacy testing, he opined Hale would have
significant difficulty with tasks involving reading beyond the second- or third-grade
level.  Additionally, Hale testified he could only read road signs with which he was
familiar, and if he traveled out of familiar areas, he would become lost.  He also
testified he could only read well enough to tell the difference between a post office
box and a trash can.  Hale further testified that, although he studied for the GED test
with his girlfriend, he was adamant he did not read any questions in doing so.  He
also testified he did not read any of the notices sent to him by the Social Security
Administration, and he learned of the September 2021 hearing through a phone call
from Morgan.  This testimony is supported by Hale's absence at the June 2022

hearing, at which time Morgan explained Hale had changed his telephone number, and she had been unable to contact him.

Moreover, the sole writing sample of Hale's contained in the record indicates, as the court previously stated, severe limitations in Hale's ability to write a simple message. The ALJ did correctly state in his decision that Hale was able to obtain a driver's license at age 18 by taking a test in a room full of people. However, when asked if it was a written test, he responded, "Yeah, I reckon. It's been so long ago." (R. at 590.) Then, in response to the question, "So you were able to read the written test to … get your driver's license?" Hale said, "Yeah, I guess … I done something. I don't know." (R. at 590.) Thus, Hale expressed that he did not necessarily recall the specifics surrounding taking this test. In further support of his finding that Hale had a marginal education, the ALJ noted that, during Smith's May 2021 consultative psychological examination, Hale reported performing various activities of daily living that ordinarily would require some reading, including frequently grocery shopping; that he appeared to have the financial acumen necessary to make his own purchases, as evidenced by his ability to accurately estimate the price of several staple items; and that he managed his own bank account and paid monthly bills by issuing debits over the phone or scheduling autodrafts. (R. at 556.) The court notes, however, that Hale could grocery shop without the ability to read. He never testified, nor was he asked, if he made grocery lists, and he might have been making frequent trips because he could not make lists. The court further notes that a finding of "financial acumen" is not necessarily related to the ability to read or write a simple message, and, although managing a bank account might require more reading ability, conducting financial transactions over the phone would not. Moreover, although the ALJ considered that Hale previously performed skilled work, Hale testified this

work did not require him to read or write any reports, but "it was all oral."  (R. at 597.)

For all these reasons, I cannot find that substantial evidence supports the ALJ's finding that Hale was not illiterate, but, instead, had a marginal education. Nonetheless, for the reasons that follow, I find that such an error was harmless.  The Fourth Circuit routinely applies the doctrine of harmless error in evaluating whether to remand a disability appeal based on an ALJ error.  *See Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 658 (4th Cir. 2017) (citing *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009)).  Harmless error review is grounded in sound considerations of administrative policy to avoid "idle and useless formalit[ies]" by converting judicial review of agency action "into a ping-pong game."  *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969).  Unless there is a "reason to believe that the remand might lead to a different result," neither the law, nor common sense, requires a remand in "quest of a perfect opinion."  *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (citations omitted).  Instead, when an ALJ's decision "is so overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time."  *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2004) (quoting *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)).  For the reasons that follow, I find that, despite the ALJ's error, remanding the case would be a waste of time.

First, a finding of illiteracy still would not direct a disability finding under the Grids.  Specifically, illiteracy only results in a finding of disability for an individual closely approaching advanced age who can perform light work if he has no past work or unskilled past work.  *See* 20 C.F.R. Part 404 Subpt. P, App. 2, Rule 202.09 (2023). That is not the case here, as the vocational experts testified Hale's past work was

skilled. Additionally, the ALJ's hypotheticals to vocational experts Wells and Bierley included limitations to jobs that required no reading or writing, as well as those in which instructions could be provided either orally or by demonstration. Even with those limitations, the vocational experts testified jobs existed in significant numbers in the national economy that such an individual could perform. Thus, I find that the ALJ's hypotheticals accounted for Hale's illiteracy, even though he did not find he was illiterate, thereby rendering this error harmless. Moreover, I find that because the ALJ included the reading and writing limitations in the hypotheticals, the vocational experts' testimony constitutes substantial evidence upon which the ALJ was entitled to rely in rendering his disability decision. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (in order for vocational expert's opinion to be relevant or helpful, it must be in response to a proper hypothetical question fairly setting out all of a claimant's impairments).

Next, Hale argues the ALJ erred by failing to follow the court's order to consider his severe panic attacks. (Plaintiff's Brief at 24-35.) For the reasons that follow, I disagree. First, as noted by the Commissioner, the ALJ ordered a consultative examination with psychologist Dietrich and psychological examiner Smith that evaluated Hale's alleged panic symptoms, which was completed in May 2021. However, when that evaluation was deemed to pertain to Hale's current limitations, (R. at 551), the ALJ sent interrogatories to psychologist Tessnear, who opined, among other things, that, during the period from February 27, 2013, to February 26, 2018, Hale's ability to concentrate, persist or maintain pace was mildly limited by anxiety. He also found that Hale had occasional irritability, most likely from chronic pain, which, in addition to some degree of anxiety, would make it difficult for him to effectively work with the general public. He opined Hale was mildly limited in his ability to interact with others. Tessnear opined Hale would be

off task eight to 10 percent during a typical eight-hour workday, he would be absent from work one day monthly due to his impairments, and he could maintain attention and concentration for two-hour segments. The ALJ gave significant weight[15] to these opinions of Tessnear, noting that, although he neither treated nor examined Hale, he was a licensed clinical psychologist who reviewed the available records at the time he completed the interrogatories. (R. at 549.) The ALJ also noted Tessnear's work-related limitations generally were supported by his analysis, including the following: (1) the only mental abnormalities reflected in the treatment records during the relevant time were mood-related; and (2) the ALJ considered Hale's subjective reports of mood and anxiety symptoms, as well as his diagnoses of borderline intellectual functioning and specific learning disorder based on the testing results obtained during Smith's consultative examination. (R. at 549.) Moreover, the ALJ found Tessnear's opinions to be generally consistent with the conservative management of Hale's mood and anxiety symptoms during the time he pursued treatment for these issues, including routine medication management by a primary care provider, which does not suggest a need for a greater mental health limitation than opined by Tessnear. (R. at 549.) However, the ALJ did find that Tessnear's assessment was only partially consistent with other evidence suggesting greater limitations were warranted in some areas, including the ability to interact with others, which the ALJ opined was moderately limited due to Hale's subjective complaints of mood and anxiety issues, coupled with abnormal mood or affect at times. (R. at 549.) Thus, in considering Hale's panic and anxiety symptoms, the ALJ limited him to frequently interacting with co-workers, occasionally interacting with supervisors and never interacting with the general public. (R. at 549.) Also,

---

[15] Hale does not argue that the ALJ erred in his weighing of the opinion evidence, and the court discusses it only to the extent it shows the ALJ thoroughly considered Hale's symptoms of panic.

due to Hale's complaints of anxiety and difficulty sleeping during the relevant period, as well as his borderline intellectual functioning, the ALJ concluded Hale had moderate, instead of mild, limitations in the ability to concentrate, persist or maintain pace, opining he could maintain attention and concentration for two-hour segments with normal breaks. (R. at 549.) Finally, the ALJ said Hale's anxiety and sleep-related symptoms were considered in finding he would occasionally be off task and absent, as reflected in the residual functional capacity finding. (R. at 539-40, 549.)

When Hale's representative submitted additional interrogatories to the ALJ for Tessnear's consideration, the ALJ approved 10 of them. Relevant responses by Tessnear included that, although Hale suffered chronic psychological conditions that reasonably could cause the symptoms he alleged, diagnoses alone may not describe symptom severity. Tessnear further stated that Hale did not complain of and receive treatment for depression and anxiety from February 27, 2013, to February 26, 2018, and there was no record of treatment after July 1, 2013. Tessnear noted that there were three visits in 2010 and 2012, as well as a medical consultative examination from 2016 that noted anxiety, but it was not a treatment visit. He stated that Hale had a diagnosis of insomnia during the first half of 2013, but not during the entire period. However, Tessnear found Hale's insomnia was not "chronic" during the period at issue since it was noted only during the first half of 2013. The ALJ gave Tessnear's second interrogatory responses partial weight, insofar as the opinions that that Hale had "chronic psychological conditions" and had reading limitations were supported by Tessnear's analysis and were partially consistent with other evidence, as previously explained. (R. at 549.) Specifically, the ALJ noted the evidence established Hale had additional medically determinable impairments, considering his subjective reports of mood and anxiety symptoms and insomnia, both prior to

33

and during the relevant period.  (R. at 549.)  The ALJ concluded Hale had "severe" impairments, including depressive disorder; anxiety; borderline intellectual functioning; specific learning disability; and insomnia.

Lastly, the court notes that in October 2021, psychologist Lawhon performed a consultative psychological evaluation of Hale at Morgan's request and completed an interrogatory a few days later in November 2021.  In the October 2021 opinion, Lawhon opined Hale was mildly to moderately limited in his ability to understand and remember; moderately limited in his ability to sustain concentration and persistence; not significantly limited in social interaction; and severely limited in work adaptation.  In November 2021, Lawhon opined Hale was moderately limited in his ability to understand, remember or apply information; markedly limited in his ability to concentrate, persist or maintain pace; mildly limited in interacting with others; and moderately limited in adapting or managing himself.  He also found Hale had diagnoses of panic and/or anxiety disorder, as well as insomnia, during the relevant period, for which he was prescribed medication.  Lawhon also found Hale's impairments met or equaled the listing for anxiety-related disorders.  He opined Hale was experiencing anxiety both during the day and nighttime hours, and his anxiety was making it difficult to sleep, resulting in panic and night terrors.  Lawhon further opined Hale would miss one or more days weekly unless his insomnia was successfully treated.  He further opined Hale's time off task already was affected by his borderline intellectual functioning and would deteriorate significantly without proper sleep.  In particular, Lawhon opined he likely would be off task 30 to 50 percent more per day without proper sleep.  He further opined Hale could maintain attention and concentration for two-hour segments with successful treatment for his anxiety and depression.   Lawhon further opined Hale could not print simple sentences containing a subject, verb and object, and series of numbers, names and

addresses; he explained that Hale had a limited ability to read, which would limit his ability to write, and his understanding of numbers, names and addresses likely would include multiple mistakes.

The ALJ gave no weight to Lawhon's opinions, stating that, although he reviewed Hale's medical reports and interviewed and examined him, the opinions were unsupported for several reasons. (R. at 552.) First, the ALJ stated many of the limitations identified in the October 2021 report conflicted with those he identified just a few days later in his interrogatory response. (R. at 552.) Next, the ALJ stated Lawhon offered no narrative explanation for his conclusion that Hale's mental impairments met or equaled a listing, and the ALJ found they were not of listing-level severity because he was moderately limited in the ability understand, remember and apply information; to interact with others; and to concentrate, persist or maintain pace; and mildly limited in the ability to adapt or manage himself. (R. at 537-39, 552.) The ALJ also noted that Lawhon's suggested "marked" or otherwise potentially disabling limitations were inconsistent with other evidence relevant to the period at issue, including treatment notes from the first part of 2013 indicating Hale was awake and alert, with appropriate judgment, good insight, proper orientation and intact recent and remote memory, although mood and affect were abnormal at times. Moreover, the ALJ correctly noted there was no documented mental health treatment after April 2013, and Hale reported in 2016 that he had not seen anyone for anxiety after 2013. (R. at 552.) Nonetheless, the ALJ correctly stated that Hale's mental health during the relevant period was treated conservatively, thereby failing to establish a need for excessive absences or time off task. (R. at 552.) For instance, he noted that, in March 2013, Dr. Bhatia, Hale's primary care provider, continued him on Vistaril and trazodone, discussed sleep hygiene and urged him to take Paxil as previously prescribed. (R. at 552-53.)

Additionally, Dr. Bhatia's April 2013 treatment note shows no worsening of Hale's mental health, and certainly not to a degree that would result in excessive absences or off-task behavior.  (R. at 553.)

In addition to these consultative examinations, the ALJ discussed Hale's alleged panic and anxiety symptoms, and he noted Hale's complaints that they impacted his sleep.  He further stated Hale had taken Vistaril for panic symptoms, which typically occurred at night.  However, the ALJ also correctly noted that the treatment notes from the relevant period generally described Hale as alert, oriented, without obvious distractibility, lethargy or slow thinking, speech or movements. The ALJ explained that he considered Hale's symptoms and accounted for them in his residual functional capacity finding.  The ALJ reasonably concluded that Hale failed to produce evidence of work-related limitations due to his alleged panic symptoms during the relevant period.  *See* 20 C.F.R. §§ 404.1512(a), 416.912(a) (2023) ("you have to prove to us that you are disabled.").

For all the reasons stated herein, I find that the ALJ did not err by failing to consider Hale's symptoms of severe panic and anxiety, and substantial evidence supports the ALJ's mental residual functional capacity finding.

Lastly, Hale argues the ALJ erred by failing to develop the record with respect to his alleged illiteracy and his symptoms of panic.  (Plaintiff's Brief at 24-35.)  It is well-settled that the ALJ has a duty to fully and fairly develop the record so he may make an informed decision regarding eligibility for benefits.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (the Commissioner has a duty "to explore all relevant facts and inquire into the issues necessary for adequate development of the record.").  The ALJ may not "rely only on the evidence submitted by the claimant

when that evidence is inadequate." *Cook*, 783 F.2d at 1173. "[F]ailure to ask further questions and to demand the production of further evidence, … [may] amount[] to neglect of [the ALJ's] duty to develop the evidence." *Cook*, 783 F.2d at 1173-74. However, I find that here, the ALJ adequately developed the record with regard to Hale's illiteracy and panic and anxiety symptoms so that he could make an informed decision regarding eligibility for benefits. In particular, as stated above, he obtained a consultative examination from psychologist Smith and sent interrogatories to psychologist Tessnear regarding these issues, and Hale's representative also obtained a consultative examination from Lawhon and sent interrogatories to psychologist Tessnear. To find that the ALJ should be required to do more would "transform the ALJ into claimant's counsel." *Johnston v. Colvin*, 2014 WL 534080, at *9 (W.D. Va. Feb. 10, 2014) (duty to fully develop record does not transform ALJ into claimant's counsel, and ALJ has right to assume counsel is presenting claimant's strongest case for benefits).

Therefore, I find that the ALJ did not fail to adequately develop the record as to Hale's alleged illiteracy and panic symptoms.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's finding that Hale was not illiterate, but, instead, had a marginal education;

2. This error is harmless, however, because the vocational experts' testimony that Hale could perform a significant

number of jobs in the national economy was based on
hypotheticals that precluded any work requirement for
reading and writing and, thus, constituted substantial
evidence upon which the ALJ could rely;

3.    Substantial evidence exists in the record to support the
ALJ's mental residual functional capacity finding;

4.    The ALJ adequately developed the record; and

5.    Substantial evidence exists in the record to support the
Commissioner's finding that Hale was not disabled under
the Act and was not entitled to benefits at any time prior to
December 31, 2015, for DIB benefits or prior to February
26, 2018, for SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Hale's motion for summary
judgment, grant the Commissioner's motion for summary judgment and affirm the
Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. §
636(b)(1)(C):

Within fourteen days after being served with a copy [of this
Report and Recommendation], any party may serve and file written
objections to such proposed findings and recommendations as provided
by rules of court. A judge of the court shall make a de novo
determination of those portions of the report or specified proposed
findings or recommendations to which objection is made. A judge of
the court may accept, reject, or modify, in whole or in part, the findings

or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     March 6, 2024.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE